445 So.2d 1063 (1984)
Norman GAYLIS and Natalie Gaylis, Appellants,
v.
Steven J. CAMINIS, Appellee.
No. 83-377.
District Court of Appeal of Florida, Third District.
February 14, 1984.
Rehearing Denied March 23, 1984.
*1064 Stanley Jay Bartel, Miami, for appellants.
Steel, Hector & Davis and Donald M. Middlebrooks, Miami, for appellee.
Before SCHWARTZ, C.J., and HENDRY and FERGUSON, JJ.
PER CURIAM.
Dr. and Mrs. Gaylis, sellers of the property giving rise to the instant lawsuit, appeal from a final judgment finding that the buyer, Mr. Caminis, had a right to repudiate the contract for the purchase of appellants' townhouse and that he is entitled to a refund of his deposit. Because we find that the ruling was clearly erroneous as a matter of law, we reverse.
Very briefly, the facts are as follows: The sales contract was signed on March 5, 1981. On May 13, 1981, appellee buyer notified appellants of two alleged title defects. One defect, a party wall encroachment, was admittedly material and affected the marketability of the title. That problem was resolved by a quitclaim deed and an adjustment of the mortgage. The second alleged defect concerned a common roadway which did not match the boundaries on the recorded plat. The townhouse association was attempting to resolve that problem by means of quitclaim deeds. The sole impediment to the swift resolution of the wayward roadway issue was the developer, who was being asked to pay for the cost of preparing and recording the quitclaim deeds. It was admitted that the roadway did not encroach upon or affect the property involved in this case. Even so, appellants drafted indemnity and escrow agreements protecting appellee from eventualities caused by the roadway problem and agreeing to pay for any legal expenses incurred if the townhouse association became involved in litigation against the developer. A further provision assured appellee that as soon as the roadway problem was resolved, an endorsement would be added to the title insurance policy removing the roadway issue as an exception. This solution was agreeable to the lender, who also agreed to extend its commitment to finance the mortgage at 14 1/2 percent interest, another condition of the contract between the parties. Closing was set for June 14, 1981. Asserting, however, that the indemnity agreement did not adequately protect his interests, appellee refused to close and declared the contract null and void. On July 6, 1981, appellee again stated that the transaction was cancelled and he demanded the return of his deposit.
While both parties argue whether the alleged roadway defect was of such materiality as to render the title unmarketable and/or uninsurable, we find that we do not have to reach that issue. We focus our attention instead on the actions of the parties. The portion of the sales contract most relevant for our consideration states as follows:
Buyer shall have 15 days from the date of receiving the abstract to examine same and if title is found to be defective, Buyer shall notify Seller in writing specifying the defects within that 15 day period. If said defects render the title unmarketable, Seller shall have 120 days from receipt of such notice to cure the defects, and if after said period Seller shall not have cured the defects, Buyer shall have the option of either (1) accepting *1065 the title as it is then, or (2) demanding a refund of all monies paid hereunder ... (emphasis supplied)
Thus, it is clear that appellee's actions in this case constituted an anticipatory breach of the contract. As stated in Mori v. Matsushita Electric Corp., 380 So.2d 461, 463 (Fla. 3d DCA), cert. denied, 389 So.2d 1112 (Fla. 1980):
A prospective breach of the contract occurs when there is absolute repudiation by one of the parties prior to the time when his performance is due under the terms of the contract. Such a repudiation may be evidenced by words or voluntary acts but the refusal must be distinct, unequivocal, and absolute.
Appellee's absolute act took place on June 11, 1981, when he notified both the lender and the appellants that the contract was declared null and void.[1] This was less than 30 days after appellants first learned of the title defects. Under the terms of the sales contract, the appellants had 120 days to cure the defects. Even if appellee was correct in refusing to accept the indemnity and escrow agreements, he was still under an affirmative obligation to wait out the 120 day period. If, at the end of that time, the title defects had not been cured or if it was no longer possible to obtain financing at 14 1/2 percent, then appellee had a right to rescind the contract and receive a refund of the monies paid. But, given the facts that one title defect was cured at this point, one was in the process of being cured,[2] and the lender had already extended the 14 1/2 percent mortgage commitment once, appellee had no right to repudiate the contract based upon a "business judgment" that the terms of the contract could not be met within the 120 day period.
The law is clear that a repudiation relieves the nonbreaching party of its duty to tender performance and gives rise to a claim for damages. Hospital Mortgage Group v. First Prudential Development Corp., 411 So.2d 181, 182 (Fla. 1982); Poinsetta Dairy Products, Inc. v. Wessel Co., 123 Fla. 120, 166 So. 306 (1936); Southern Crane Rentals, Inc. v. City of Gainesville, 429 So.2d 771 (Fla. 1st DCA 1983). The sales contract provides that upon default by the buyer, the seller may elect to retain the deposit paid by the buyer or he may proceed at law or in equity to enforce his legal rights under the contract. We leave that issue for further disposition by the trial court. We also direct the trial court to enter an appropriate award of attorney's fees and costs to appellants as provided by the sales contract.
Reversed and remanded with directions.
NOTES
[1] It should be noted, however, that appellee's May 13, 1981 letter, which first notified appellants of the title defects, also stated that because of the title defects he wished to cancel the contract.
[2] The testimony of appellee's former counsel reflects that the roadway problem was resolved in late summer or early fall, 1981, apparently without resort to litigation.